Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 50062 | **DATE** | 8/3/2001 |
| **CASE TITLE** | Harris vs. Bethesda Lutheran Homes, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's motion for summary judgment and motion to strike

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated on the attached Memorandum Opinion and Order, defendant's motion to strike is granted in part and denied in part, and its motion for summary judgment is granted. This case is hereby dismissed in its entirety with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| X | Notices mailed by judge's staff. | | AUG - 6 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| X | Mail AO 450 form. | | 8-3-01 | |
| X | Copy to judge/magistrate judge. | | date mailed notice | |
| /LC | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

DOCKETED
AUG - 6 2001

SUSAN HARRIS,                     )
                                  )
        Plaintiff,                )
                                  )
v.                                )   No. 99 C 50062
                                  )
BETHESDA LUTHERAN HOMES, INC.     )
                                  )
        Defendant.                )

**MEMORANDUM OPINION AND ORDER**

### I. INTRODUCTION

Plaintiff, Susan Harris, originally filed her three-count complaint against defendant, Bethesda Lutheran Homes, Inc. ("Bethesda"), in an Illinois state court. As Harris is a citizen of Illinois, Bethesda is a Wisconsin corporation with its principal place of business in Wisconsin,[1] and the amount in controversy exceeds $75,000, Bethesda removed the case to this court under 28 U.S.C. § 1441 on the basis of diversity jurisdiction, see id. § 1332. Relevant to this order are Counts I and III of the complaint,[2] which are claims brought under Illinois common law for retaliatory discharge (Count I) and

---

[1] Although Harris alleged in her complaint Bethesda is an "Illinois registered corporation," Bethesda indicated in its Notice of Removal it is in fact incorporated in Wisconsin and has its principal place of business there. Harris does not dispute, and even admits, Bethesda is a citizen of Wisconsin for diversity purposes. (LR 56.1(a) Pl. Resp. ¶ 2)

[2] The court dismissed Count II in a previous order.

defamation (Count III). Before the court is Bethesda's motion for summary judgment on these two counts, filed pursuant to Federal Rule of Civil Procedure 56, as well as its motion to strike the affidavits of Harris and Jacqueline Montville.

## II. **BACKGROUND**

Bethesda, which provides nursing home care for developmentally disabled individuals, employed Harris as a Licensed Practical Nurse from January 1995 until her termination on November 4, 1997, at its facility in Aurora, Illinois. (LR 56.1(a) ¶¶ 3-4) What immediately prompted Harris' termination was an incident involving one of Bethesda's residents, Theresa Rhoda. While on duty the night of October 28, 1997, Harris noticed Rhoda was coughing and having trouble eating dinner. (Id. ¶ 14; Def. Exh. D, Bates no. 25) She then called and described the symptoms to Rhoda's treating physician, Dr. Albrecht, who ordered Harris to send Rhoda to the emergency room, although Harris also says Dr. Albrecht left it to her discretion to send Rhoda that night or the following morning. (LR 56.1(a) ¶ 15; LR 56.1(b) ¶ 14; Def. Exh. A, Harris dep., pp. 207-08) Apparently because it was late and she did not receive the doctor's order until near the end of her shift (Harris worked second shift, from 3:00 p.m. to 11:00 p.m.), Harris did not send Rhoda to the emergency room at that time but decided Rhoda could in fact wait until morning. (LR 56.1(a) ¶ 5; Def. Exh. A, Harris dep., p. 208) So Harris filled out an order to transport Rhoda

to the E.R. for "chest congestion and chest x-ray" and contemporaneously left the following explanation in the "Nurses' Progress Notes": "E.R. evaluation for upper respiratory congestion and chest x-ray - ordered by Dr. Albrecht. . . . [W]ill be sent tomorrow to hospital. Dr. left it up to us to send her either tonight or tomorrow." (LR 56.1(a) ¶ 16; Def. Exh. D, Bates no. 25)

When Julie Borden, Bethesda's Director of Nursing and Harris' immediate supervisor, came in to work the next morning, she reviewed the transport order and Harris' notations in Rhoda's chart but noticed Rhoda had never been sent to the emergency room. (LR 56.1(a) ¶ 20; Def. Exh. B, Borden dep., pp. 66-67) Understanding an order to transport a patient to the E.R. meant an actual emergency, Borden contacted Dr. Albrecht to clear up the inconsistency between the transport order and Harris' notes that the order could wait until the morning to be carried out. (LR 56.1(a) ¶¶ 20, 21; Def. Exh. B., Borden dep., pp. 67-68) Dr. Albrecht explained his conversation with Harris the night before and asked how Rhoda was doing. Based on Borden's assessment of Rhoda's condition, which had apparently improved overnight, Dr. Albrecht retracted his original order. (LR 56.1(a) ¶ 23) Later that day Harris returned at 3:00 p.m. for her regular shift and discovered Rhoda had not been transferred to the E.R. (Id. ¶ 24; LR 56.1(b) ¶ 16; Def. Exh. A, Harris dep., p. 209) When she asked what happened, Linda Knox, one of Bethesda's "habilitation

-3-

aides" or "hab aides," told Harris about Borden calling Dr. Albrecht and the doctor rescinding his transport order. (LR 56.1(a) ¶ 24)

The next night, on October 30, Rhoda started coughing and choking when Harris tried to give Rhoda her medicine. (Id. ¶ 25) Harris was unable to reach the doctor, so she wrote another order for Rhoda to go to the hospital. (Id.) This time Rhoda was admitted and diagnosed with pneumonia. (LR 56.1(b) ¶ 17)

A hab aide by the name of Dee Dee (last name unknown) was later sent to the hospital to help feed Rhoda. While there, Dee Dee told Rhoda's family Rhoda had been ill for quite a while, she had reported it to Borden, and Borden had done nothing. (Id. ¶ 28; LR 56.1(b) ¶ 19; Def. Exh. A, Harris dep., pp. 212, 267) Upon returning to the nursing home, Dee Dee told Harris what she had said to Rhoda's family. (Def. Exh. A, Harris dep., pp. 212, 267) At this point, although the record is not entirely clear, Harris tacitly admits she talked about Borden with other hab aides, essentially accusing Borden of not doing her job and neglecting Rhoda by not sending her to the E.R. on the morning of the 29th. (LR 56.1(a) Pl. Resp. ¶ 26; Def. Exh. B, Borden dep., p. 75; Def. Exh. C, Prince dep., pp. 62-64) Soon afterwards, Bethesda launched an internal investigation into the circumstances surrounding Rhoda's treatment, as well as Harris not following proper protocol when expressing concerns about patient care – i.e., criticizing Borden in front of hab aides

-4-

rather than reporting to Bethesda's administrators. (LR 56.1(a) ¶ 39) Around the same time, Borden confronted Harris about these matters, only to have Harris yell at her, accuse her of lying, and blame her for what happened to Rhoda. (LR 56.1(a) ¶¶ 31, 42)[3]

About a week later, on November 4, 1997, Jan Nass, Bethesda's Administrator, terminated Harris. (Id. ¶ 43) The reasons Nass gave for Harris' discharge, recited in a follow-up letter dated November 6, were a "lack of professionalism and a failure to report concerns according to the established protocol," combined with three previous disciplinary actions taken against Harris. (LR 56.1(b) Def. Reply Exh. F) Nass stated it was unprofessional for Harris to blame Borden for not sending Rhoda to the emergency room when Harris herself had personally received Dr. Albrecht's order but chose not to do so, and then subsequently complain about Borden to the direct care staff rather than take up her concerns with her superiors. (Id.)

## III. ANALYSIS

### A. Motion to Strike

In response to Bethesda's motion for summary judgment, Harris filed her own supplemental affidavit and an affidavit from

---

[3] Harris denies the tenor and content of this conversation but does so without a proper citation to the record. Instead, she points to a nonexistent paragraph 22 of her affidavit. Borden's version of this confrontation is therefore deemed admitted. See N.D. Ill. R. 56.1(b)(3)(B).

Jacqueline Montville, another former nurse at Bethesda. Bethesda, in turn, has filed a motion to strike both affidavits.

As for Montville, Bethesda claimed Harris never disclosed her as a potential witness during pretrial discovery. When Bethesda raised this issue before Magistrate Judge Mahoney, he agreed and allowed Bethesda to take Montville's deposition. Bethesda did so and has filed that deposition as an attachment to its "Supplemental Statement of Additional Material Facts." With the deposition now part of the record, and providing more detail than Montville's affidavit, the affidavit no longer serves any useful purpose. Besides that, Montville's testimony (both her affidavit and deposition testimony) is largely irrelevant and, hence, inadmissible. Montville recalls various run-ins she had with Borden regarding patient care at Bethesda but admits she has no personal knowledge of any of the circumstances surrounding Harris' termination; in fact, Montville left Bethesda some six months before Harris was fired. For all these reasons, the court grants this part of Bethesda's motion and strikes Montville's affidavit.

Most of Harris' supplemental affidavit is nothing more than an innocuous recap of her deposition testimony. The rest of it, as discussed below, is simply insufficient to create any material issues of fact for purposes of summary judgment. The court thus finds it unnecessary to strike Harris' affidavit.

B. **Motion for Summary Judgment**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Chavez v. Illinois State Police, 251 F.3d 612, 635 (7th Cir. 2001). To determine whether a genuine issue of material fact exists, the court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. See Chavez, 251 F.3d at 635. A genuine issue for trial exists only when a reasonable jury could find for the nonmoving party based on the record as a whole. See id.

1. **Retaliatory Discharge (Count I)**

To state a claim of retaliatory discharge in Illinois, Harris must demonstrate she was (1) discharged (2) in retaliation for her activities and (3) her discharge violated a clear mandate of public policy. See Hartlein v. Illinois Power Co., 601 N.E.2d 720, 728 (Ill. 1992). In this case, Harris alleges Bethesda fired her in retaliation for reporting the abuse and neglect of residents at Bethesda. She claims her discharge violates Illinois public policy as expressed in various state statutes dealing with the treatment of nursing home residents. As there is no doubt Harris was indeed discharged, the parties have focused their attention on the second two elements.

Taking up the third part of the test first, Bethesda spends

-7-

a great deal of time arguing the Illinois Supreme Court's recent opinion in Fisher v. Lexington Health Care, Inc., 722 N.E.2d 1115 (Ill. 1999), forecloses Harris' claim of retaliatory discharge. In the court's view, Bethesda has either misread Harris' complaint or read too much into Fisher. In Fisher, the Illinois Supreme Court held nursing home employees who are retaliated against by their employer could not imply a private right of action under § 3-608 of the Illinois Nursing Home Care Act, 210 ILL. COMP. STAT. 45/3-608. See Fisher, 722 N.E.2d at 1121. Harris, however, is clearly not bringing a private cause of action under that statute. Instead, she is basing her claim on the common law tort of retaliatory discharge and merely cites the Nursing Home Care Act, as well as a companion statute, the Illinois Abused and Neglected Long Term Care Facility Residents Reporting Act, 210 ILL. COMP. STAT. 30/4, as an expression of public policy in support of her claim. At least one Illinois appellate court before Fisher specifically found this to be a viable theory. See Shores v. Senior Manor Nursing Ctr., Inc., 518 N.E.2d 471, 473-74 (Ill. App. Ct. 1988), and an Illinois federal district court after Fisher has rejected the exact same argument Bethesda now makes before this court, holding that this type of retaliatory discharge claim survived Fisher. See Radimecky v. Mercy Health Care and Rehab. Ctr., No. 00 C 2889, 2000 WL 1644510, at *4 (N.D. Ill. Oct. 26, 2000). As a theoretical matter, the court agrees that, if Harris could show

-8-

she reported instances of patient neglect and Bethesda fired her for that reason, then she would have a claim under Shores. But the court ultimately need not decide whether Fisher implicitly overruled Shores because, even assuming it did not, the evidence in this case simply does not demonstrate Harris engaged in any type of protected activity.

Bethesda does well to recognize that the tort of retaliatory discharge is not limited to an employee reporting illegal or improper conduct to just public officials. Illinois case law makes clear that internal complaints of misconduct to superiors within the company are sufficient to trigger a retaliatory discharge claim. See, e.g., Stebbings v. University of Chicago, 726 N.E.2d 1136, 1145 (Ill. App. Ct. 2000); Lanning v. Morris Mobile Meals, Inc., 720 N.E.2d 1128, 1130-31 & n.1 (Ill. App. Ct. 1999) (collecting other Illinois cases). Along these lines, Harris argues Bethesda terminated her because she "was continually and loudly reporting to her superiors the fact that, time after time, patients at . . . Bethesda . . . were not receiving timely and appropriate medical care." While this is a good argument in theory, the problem for Harris is that the record does not bear her out.

After Dee Dee the hab aide told Rhoda's family she believed Borden had neglected Rhoda and then told Harris what she had said to the family, Harris turned around and created more scuttlebutt on the floor by repeating the same accusations to other direct

care staff and hab aides. It was not until Bethesda's investigation got under way that Harris said anything to Borden or any of Bethesda's administrators, and then it was only because Borden confronted Harris about her conduct. During this meeting with Borden, Harris essentially told Borden it was her (Borden's) fault for what happened to Rhoda because she (Borden) did not follow through with Dr. Albrecht's order. In short, none of this amounts to Harris informally reporting Borden's supposed neglect of Rhoda. First of all, no cases allow a retaliatory discharge claim to go forward based on a plaintiff gossiping among her coworkers that their supervisor had done something wrong. Instead, the informal complaint cases require the employee to report her concerns to her superiors or at least a person in charge. See, e.g., Stebbings, 726 N.E.2d at 1139, 1145 (researcher reported safety violation to committee head); Sherman v. Kraft Gen. Foods, Inc., 651 N.E.2d 708, 710-11 (Ill. App. Ct. 1995) (employee reported asbestos violations to plant safety representative); Shores, 518 N.E.2d at 475 (nursing home employee reported violations of Nursing Home Care Act to hospital administrator). Second, the conversation between Borden and Harris can hardly be construed as whistle blowing. At best, it was a disagreement between the two as to the proper care for Rhoda; at worst, it was an attempt by Harris to blame Borden for what happened to Rhoda.

There is some sketchy evidence in the record that Harris

discussed the Rhoda situation with Michelle Latrell Prince, Bethesda's Administrator-on-call that night, shortly after the family found out what happened. (LR 56.1(a) ¶ 30; Def. Exh. A, Harris dep., p. 213) But from what the court can tell, Prince simply asked Harris to detail in a letter her version of the Rhoda situation. Nothing in the record indicates Harris used this opportunity to tell Prince she believed Borden was neglecting patients.

Apart from Rhoda, Harris "believes at trial the evidence will show . . . a pattern and practice engaged in by certain supervisory personnel at [Bethesda] to refuse or delay the reference of patients for outside medical treatment . . . and that Harris clashed with her supervisors over her insistence that those referrals be made . . . ." To prove this "pattern and practice," Harris says in her affidavit she believed Borden "did not do enough to insure [sic] that her patients received necessary medical treatment" and felt "Borden's actions in certain cases constituted abuse and neglect." (LR 56.1(b) ¶ 8) She also claims she "made what she believed were reasonable attempts to discuss this issue with Borden and other supervisory personnel." (Id. ¶ 9) These statements appear to be vague references to other disagreements Harris had with Borden in the past regarding the care of two other Bethesda residents, Carol Stevenson and another known only as "Louise." (LR 56.1(a) ¶¶ 46-52) During her deposition, Harris recalled on separate occasions

Stevenson suffered from a case of scabies and Louise from a broken clavicle. Once Harris had brought her concerns about these problems to Borden's attention, Harris believed Borden took too long to order outside medical treatment for Stevenson and Louise. (Id.)

Besides these incidents occurring some eight to ten months before Bethesda fired Harris, the record is once again devoid of any evidence that Harris actually made any sort of report to Bethesda's administrators or Illinois Department of Public Health ("IDPH") officials that Borden was neglecting these two residents. Instead, Harris simply reported her observations to Borden, all in the normal course of her duties as a staff nurse. It is clear Harris and Borden had differing opinions as to the proper course of treatment for Stevenson and Louise, but there is no indication it was anything more than that. Harris says in her affidavit she made "reasonable attempts to discuss" with "other supervisory personnel" Borden not doing "enough to insure [sic] that her patients received necessary medical treatment," but the court is left to wonder, "What reasonable attempts?" Nothing in the record (outside of Harris' conclusory affidavit) suggests Harris ever told Bethesda management she felt Borden's failure to immediately treat Stevenson and Louise constituted neglect.

The Seventh Circuit has made clear a motion for summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier

-12-

of fact to accept its version of events." Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 503-04 (7th Cir. 1997), rev'd on other grounds, 524 U.S. 381 (1998). The sort of conclusory and self-serving statements in Harris' affidavit will not get the job done. It is likewise too late for Harris to say what she "believes the evidence at trial will show." Her moment was now and she has failed to provide sufficient competent evidence that Bethesda fired her in retaliation for reporting instances of neglect at the nursing home.

## 2. **Defamation (Count III)**

Harris also claims Bethesda defamed her when, after it terminated her, it informed the IDPH and the Illinois Department of Employment Security ("IDES") that she had been fired for unprofessional behavior and allegedly told other Bethesda employees she had been terminated because she had "done something with patient records that was unprofessional and illegal." (LR 56.1(a) ¶¶ 56-60) After setting out this factual predicate for her claim, however, Harris offers just the following two sentences as the sum of her analysis: "Plaintiff was accused of unprofessional conduct, which allegation was false and portrayed Plaintiff in a false light. After her termination from Bethesda, Plaintiff was unemployed for a lengthy period." Harris' failure to cite a single point of legal authority or develop her argument in any meaningful way is reason enough to dismiss this claim. See Muhich v. Commissioner of Internal Revenue, 238 F.3d 860, 864

n.10 (7th Cir. 2001), and cases cited therein. Nevertheless, the court can easily dispose of Harris' defamation count on the merits.

A defamation claim in Illinois requires Harris to prove (1) Bethesda made a false statement concerning her and (2) it made an unprivileged publication of the statement to a third party with fault, (3) which caused her damages. See Krasinski v. United Parcel Serv., 530 N.E.2d 468, 471 (Ill. 1988). With respect to the last element, Bethesda's argument that Harris has not provided evidence that she suffered any damages is misplaced. The statements allegedly made by Bethesda – specifically, that Harris "had done something with patient records that was unprofessional and illegal" – clearly falls under the category of defamation per se as a type of statement imputing a want of integrity in the discharge of Harris' employment and does not, therefore, require a showing of special damages. See Van Horne v. Muller, 705 N.E.2d 898, 903 (Ill.), cert. denied, 528 U.S. 811 (1999). That aside, Harris' claim still falters under the first two elements.

As for Bethesda informing the IDPH and the IDES it terminated Harris for being unprofessional, these statements were not false insofar as that really was Bethesda's stated reason for firing Harris. And even assuming the statements to be false, they are undeniably protected by the doctrine of qualified or conditional privilege. See generally Kuwik v. Starmark Star

Mktg. & Admin., Inc., 619 N.E.2d 129, 134-35 (Ill. 1993). This is because both state agencies had an interest in the matter published — the IDPH because it was conducting an investigation into Rhoda's care and the IDES because Harris apparently applied for unemployment benefits and it needed to know the reason she was discharged. See Cianci v. Pettibone Corp., 698 N.E.2d 674, 679-80 (Ill. App. Ct. 1998); 820 ILL. COMP. STAT. 405/1900.1. Moreover, Harris has done nothing to overcome this qualified privilege by showing Bethesda made these statements with actual malice. See Krasinski, 530 N.E.2d at 471.

The heart of Harris' defamation claim seems to be based on her testimony that two hab aides, Susan Gollen and Linda Knox, spoke with Harris after her termination and told Harris they had heard she was fired because she "had done something with patient records that was illegal." Yet Harris admits neither Gollen nor Knox ever told her the source of this information. (LR 56.1(a) Pl. Resp. ¶¶ 58-59) She somehow deduces it "had to have been somebody in administration" because "it's a small administrative staff" (Def. Exh. A, Harris dep., p. 177), but this is pure speculation. With absolutely no evidence to pin these rumors on Bethesda's management, Harris cannot establish Bethesda even made these false statements in the first place, let alone published them to other Bethesda employees.

## IV. CONCLUSION

For the reasons stated above, Bethesda's motion to strike is

granted in part and denied in part and its motion for summary judgment is granted. This case is hereby dismissed in its entirety, including the previously dismissed Count II, with prejudice.

E N T E R:

_____
PHILIP G. REINHARD, JUDGE
UNITED STATES DISTRICT COURT

DATED: August 3, 2001

AO 450(Rev. 5/85)Judgment in a Civil Case

# United States District Court
## Northern District of Illinois
### Western Division


DOCKETED
AUG - 6 2001

Susan Harris

v.

Bethesda Lutheran Homes, Inc.

**JUDGMENT IN A CIVIL CASE**

Case Number: 99 C 50062

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■ Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that defendant's motion to strike is granted in part and denied in part, and its motion for summary judgment is granted. This case is hereby dismissed in its entirety, including the previously dismissed Count II, with prejudice.

All prior orders are now final and appealable.

FILED-WD
2001 AUG -3 PM 3:49
CLERK
U.S. DISTRICT COURT

Michael W. Dobbins, Clerk of Court

Date: 8/3/2001

*Susan Wessman*
Susan M. Wessman, Deputy Clerk